25CA2269 GOAL Academy v ICAO 08-06-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2269
Industrial Claim Appeals Office of the State of Colorado
DD No. 7266-2025

---

GOAL Academy,

Petitioner,

v.

Industrial Claim Appeals Office of the State of Colorado and Mordecai Valdez,

Respondents.

---

ORDER SET ASIDE

Division VI
Opinion by JUDGE MOULTRIE
Grove and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 6, 2026

---

The Charter School Law Group, Part of the Law Office of Dustin R. Sparks, LLC, Amber DeCarli, Colorado Springs, Colorado, for Petitioner

No Appearance for Respondent Industrial Claim Appeals Office

Mordecai Valdez, Pro Se

¶ 1     GOAL Academy (Employer) appeals an order granting its former employee, Mordecai Valdez, unemployment benefits. We set aside the Panel's order.

## I.     Background

¶ 2     Employer is a public charter school offering hybrid online and in-person education at several locations throughout the state. Valdez worked as an academic coach for Employer before resigning his position in January 2025 and applying for unemployment insurance benefits.

¶ 3     A deputy for the Division of Unemployment Insurance (Division) denied Valdez's claim, finding that section 8-73-108(5)(e)(XXII), C.R.S. 2025, barred Valdez from receiving benefits because he resigned for personal reasons. Valdez appealed that determination to the Division, which scheduled the matter for an evidentiary hearing regarding the reasons for Valdez's job separation.

¶ 4     During the hearing, Valdez testified that, beginning in the fall of the 2021-2022 school year, Employer instructed him to issue notices of non-compliance with the attendance policy (NNCs) to guardians whose students were, in fact, compliant. According to

1

Valdez, the NNCs warned guardians that they could face legal consequences as a result of their students' non-compliance. Because Valdez felt that sending the NNCs to compliant families was legally inappropriate and would damage the relationships he had built with students' families and compromise his integrity, he refused to send them. Valdez testified that because he refused to do so, Employer improperly disciplined him multiple times. Valdez said that the last time he was asked to send NNCs to compliant students was in November 2023.

¶ 5 An assistant principal testified that Employer had progressively disciplined Valdez but that such discipline arose from other infractions. And Employer's attendance officer testified that she alone issued NNCs; that Employer never asked Valdez to issue them; and that Valdez had confused the NNCs with another form.

¶ 6 Valdez also asserted that, in September 2024, Employer asked him to "violate" a student's individualized education program (IEP) that allowed the student to take "frequent breaks." Specifically, Valdez testified that Assistant Principal Marcie Knezel and Counseling Assistant Heather Gonzales directed him to "tell the student that he shouldn't take as many breaks" as he typically did.

Valdez refused to comply, because he felt that doing so would be "illegal" and "immoral."

¶ 7 Employer called Special Education Teacher Adrianna Mullins as a witness concerning the IEP. Mullins agreed that the IEP required the school to allow the student to take "frequent breaks," but explained that the IEP didn't define or otherwise qualify the term "frequent." During her testimony, Knezel acknowledged that she told Valdez "that [she] noticed [the student's] breaks were getting excessive," but denied having directed him to "limit" the student's breaks. To address this, Knezel contacted Mullins to "meet and come up with a definition for frequent breaks."

¶ 8 Mullins met with Knezel regarding Knezel's concerns about the frequency of the student's breaks. However, Mullins said she discovered that the student took "no more than an average of seven breaks per day" of about fifteen minutes each. Mullins thus determined that the IEP "was sufficient as it was." Additionally, Mullins said that she didn't believe that Valdez was ever asked to violate the student's IEP, noting that the phrase "frequent breaks" is "open to interpretation." "So," she explained, "what is frequent to one person is not necessarily frequent to another person."

3

¶ 9    Implicitly crediting Valdez's testimony, the hearing officer found that Valdez quit because Employer required him to issue NNCs for "improper" purposes. The hearing officer also found that, as of approximately February 2022, Valdez had been disciplined multiple times for refusing to send the NNCs and, despite a change in Employer's policy in April 2024 announcing that employees should no longer send NNCs to students who were in compliance with the attendance policy, Valdez's disciplinary record wasn't modified.

¶ 10   Again, crediting Valdez's testimony, the hearing officer found that Knezel and Gonzales "told [Valdez] to limit the number of breaks the student was taking," and concluded that by doing so, Employer asked Valdez "to violate [the] student's IEP." Employer then placed Valdez on administrative leave when he refused to limit the student's breaks. Valdez remained on administrative leave from October 2024 until January 2025, when Employer asked him to return to work. The hearing officer determined that Valdez resigned instead.

¶ 11   In sum, the hearing officer found that Employer's actions "risked [Valdez's] morals and placed his job in jeopardy for doing

4

the right thing[,]" and that Valdez "quit because he was asked to send out legal notices for improper purposes and to violate a student's IEP." Given this, the hearing officer concluded that Valdez's working conditions "were objectively unsatisfactory, such that a reasonable worker, similarly situated, would find the conditions to warrant resignation," and, thus, Valdez was entitled to a full benefits award under section 8-73-108(4)(c).

¶ 12 Employer appealed the hearing officer's decision to the Panel. The Panel affirmed the hearing officer's decision.

## II. Legal Principles

¶ 13 Under section 8-73-108(5)(e)(XXII), a claimant is disqualified from receiving unemployment benefits when they resign "under conditions involving personal reasons, unless the personal reasons were compelling pursuant to other provisions of [section 8-73-108(4)]." Section 8-73-108(4) "requires a full award of benefits when an employee is separated for certain reasons and related conditions of employment." *Yotes, Inc. v. Indus. Claim Appeals Off.*, 2013 COA 124, ¶ 11. If the employer proves a disqualification under section 8-73-108(5), then the burden shifts to the claimant to demonstrate that they are nonetheless entitled to benefits under

subsection (4). *Ward v. Indus. Claim Appeals Off.*, 916 P.2d 605, 607 (Colo. App. 1995).

¶ 14     Subsection (4)(c) requires that a claimant be awarded benefits when the hearing officer determines that the claimant separated from employment due to objectively unsatisfactory working conditions. *See Yotes, Inc.*, ¶ 12. The dispositive inquiry is whether a reasonable person would deem the claimant's actual working conditions to be so unsatisfactory as to warrant resignation. *See Rodco Sys., Inc. v. Indus. Claim Appeals Off.*, 981 P.2d 699, 701-02 (Colo. App. 1999). The hearing officer must consider various factors including "the degree of risk involved to [the worker's] . . . morals." § 8-73-108(4)(c); *Yotes, Inc.*, ¶ 26. The objectively unsatisfactory working conditions must exist at the time of the employee's separation and be likely to continue to exist. *Yotes, Inc.*, ¶ 26.

¶ 15     IEPs deliver the educational rights codified in the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 to 1486. 20 U.S.C. § 1414(d)(4); *see D.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507 (2d Cir. 2006) (characterizing the IEP as the "centerpiece of the IDEA's educational delivery system"). Interpreting that legislative scheme, courts have made clear that IEPs aren't

6

contracts, but rather flexible "plans" to which schools need not "perfect[ly] adher[e]" but must only materially implement. *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 819-21 (9th Cir. 2007); *see also Couture v. Bd. of Educ.*, 535 F.3d 1243, 1252 (10th Cir. 2008) (citing *Van Duyn*, 502 F.3d at 819); *L.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1212-13 (11th Cir. 2019) (IEPs are "plans," not contracts).

¶ 16    Thus, when analyzing compliance with an IEP, courts frame the inquiry in terms of whether the school "materially failed to implement" (or, in alternate phrasing, "materially deviated from") the IEP. *Broward Cnty.*, 927 F.3d at 1211; *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011) (applying the *Van Duyn* analytical framework and using the phrase "material failure" and "material deviation" interchangeably); *see Van Duyn*, 502 F.3d at 815. "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Van Duyn*, 502 F.3d at 822. "To determine 'whether there has been a material failure to implement an IEP,'" courts look at the "proportion of services mandated to those provided." *Holman v.*

7

*District of Columbia,* 153 F. Supp. 3d 386, 393 (D.D.C. 2016) (emphasis and citation omitted).

### III.    Standard of Review

¶ 17    The hearing officer serves as the fact finder in unemployment benefits cases. *See Eckart v. Indus. Claim Appeals Off.,* 775 P.2d 97, 99 (Colo. App. 1989). A claimant's entitlement to benefits depends on the reason the claimant separated from his employment — a factual matter for the hearing officer to resolve. *Id.* Similar to the Panel, we may not disturb the hearing officer's "administrative findings as to the facts" if "supported by substantial evidence." §§ 8-74-107(4), C.R.S. 2025, 24-4-105(15)(b), C.R.S. 2025; *see Federico v. Brannan Sand & Gravel Co.,* 788 P.2d 1268, 1271-73 (Colo. 1990) (holding that section 24-4-105(15)(b) sets forth the Panel's standard of review and precludes the Panel from setting aside the hearing officer's factual findings unless they are "contrary to the weight of the evidence"). We may set aside the Panel's decision if the factual findings don't support its decision or the decision is erroneous as a matter of law. § 8-74-107(6)(c), (d).

¶ 18    Whether working conditions were objectively "unsatisfactory" under section 8-73-108(4)(c) is an ultimate conclusion of fact,

which we review de novo.  *See Commc'ns Workers of Am. 7717 v. Indus. Claim Appeals Off.*, 2012 COA 148, ¶ 7 (ultimate conclusions of fact are conclusions of law or mixed questions of law and fact, generally phrased in the language of the controlling statute or legal standard, that determine the parties' rights and liabilities); *Harbert v. Indus. Claim Appeals Off.*, 2012 COA 23, ¶ 9 (noting we review de novo ultimate legal conclusions).

## IV.    Discussion

¶ 19     Employer primarily contends that no substantial evidence supports the hearing officer's Panel-affirmed factual findings that (1) Employer improperly instructed Valdez to issue NNCs and disciplined him for refusing; and (2) Employer directed Valdez to violate a student's IEP.  Employer argues we should vacate these findings and determine that the evidence is otherwise insufficient to support the hearing officer's Panel-affirmed ultimate conclusion that Valdez is entitled to benefits under section 8-73-108(4)(c) because he was subjected to objectively unsatisfactory working conditions.  We also discern that Employer argues that the hearing

officer erred as a matter of law in determining that Employer asked Valdez to violate the IEP.[1]

¶ 20    We need not consider all of Employer's arguments because, as discussed below, we conclude that the hearing officer (and subsequently the Panel) erred as a matter of law by concluding that Valdez's working conditions were objectively unsatisfactory. Accordingly, we set aside the Panel's order without addressing Employer's remaining contentions.

## A.    The IEP

¶ 21    As noted, to determine whether there has been a material failure to implement an IEP, courts consider the extent to which services mandated by an IEP were actually provided.  *Holman*, 153 F. Supp. 3d at 393.

¶ 22    For example, where a student's IEP called for him to receive eight to ten hours of math instruction weekly, and the student

---

[1] We sua sponte struck Employer's opening brief for, among other things, failing to comply with C.A.R. 28, and provided Employer an opportunity to correct this failure through an amended brief. Though marginally improved, the Amended Opening Brief remains non-compliant, as demonstrated by its incomplete record citations, limited supporting legal authorities, and incorrect formatting.  *See* C.A.R. 28; C.A.R. 32.  We admonish counsel to comply with all provisions of the appellate rules when filing briefs with this court.

received only three to four hours of weekly instruction — or, approximately thirty to fifty percent of the time the IEP called for — the Ninth Circuit affirmed the district court's determination that the school had materially failed to implement the IEP. *Van Duyn*, 502 F.3d at 815, 823. Similarly, where a student's IEP prescribed 13.3 weekly hours of special instruction, and the student received 2.25 hours of such weekly instruction — that is, seventeen percent of the time prescribed — the court in *Holman* found that the school materially failed to implement the IEP. *Holman*, 153 F. Supp. 3d at 393.

¶ 23     Conversely, where a student experienced only a "slight decrease" in her daily instructional time during the COVID-19 pandemic, the Third Circuit affirmed the district court's determination that the school didn't materially fail to implement the student's IEP. *Abigail P. v. Old Forge Sch. Dist.*, 105 F.4th 57, 66 (3d Cir. 2024). Thus, the law allows for some deviation from an IEP's prescribed services, and the materiality analysis turns on the degree of such deviation.

¶ 24     Here, the hearing officer found that Employer asked that Valdez "limit" the student's prescribed "frequent breaks." This

finding supported the hearing officer's ultimate conclusion that Valdez's working conditions were objectively unsatisfactory because Employer demanded that Valdez violate his moral imperative to "do[] the right thing" when implementing the IEP. But the hearing officer made no determination as to whether by asking Valdez to limit the student's breaks, Employer was asking Valdez to *materially* deviate from the student's IEP. And because the hearing officer didn't conduct a materiality analysis, he had no basis from which to conclude that Employer had asked Valdez to do anything morally wrong with respect to the IEP. *See, e.g.*, *Van Duyn*, 502 F.3d at 815, 819-21. We further note that, had the hearing officer conducted such an analysis, there's nothing in the record that would support a finding that Employer asked Valdez to materially deviate from the IEP. For example, there is no evidence regarding the number of daily breaks the student usually received or the number of breaks that Employer directed Valdez to allow the student to have instead. Thus, the hearing officer's ultimate conclusion that Valdez was entitled to benefits under section 8-73-108(4)(c) as a result of Employer's IEP request was erroneous as a

12

matter of law.  Accordingly, we set aside that determination.  *See* § 8-74-107(6)(d).

## B.    The NNCs

¶ 25    The hearing officer also determined that Valdez was entitled to benefits under section 8-73-108(4)(c) based on the circumstances related to his refusal to send out NNCs.  We assume, without deciding, that the hearing officer didn't err in determining that Employer improperly instructed Valdez to issue the NNCs, punished him for doing so, and, as a result, created objectively unsatisfactory working conditions.

¶ 26    However, the hearing officer didn't make explicit findings that those working conditions existed at the time Valdez resigned and were likely to continue into the future.  *See Yotes, Inc.,* ¶ 26.  Nor does the record implicitly support such findings.  To the contrary, the hearing officer found that Employer stopped directing Valdez to send the NNCs as of November 2023 — more than a year before Valdez resigned in January 2025 — and changed its policy requiring nonauthorized employees to send out NNCs in April 2024 — approximately nine months before Valdez quit.  And although Valdez's existing disciplinary record remained, neither the record

nor the briefing to this court suggest that Valdez resigned solely because of this disciplinary record. Further, because Employer had long since stopped requiring Valdez (or any nonauthorized employee) to send NNCs, there is no record evidence to support a conclusion that Valdez would be subject to similar discipline in the future.

¶ 27 The record therefore doesn't support, either explicitly or implicitly, the conclusion that Valdez's unsatisfactory working conditions existed at the time he resigned and were likely to continue. Accordingly, we conclude that the hearing officer's determination that Valdez was entitled to benefits under section 8-73-108(4)(c) was erroneous as a matter of law, and we set it aside. *See Yotes*, *Inc.*, ¶ 26; § 8-74-107(6)(d).

## V. Disposition

¶ 28 We set aside the Panel's order.

JUDGE GROVE and JUDGE GOMEZ concur.